AUGUST F. THEIS and EMIL H. THEIS, complainants,

*v.*

ROBERT VONDERHEYDEN et ux., defendants.

[Decided December 8th, 1922.]

1. Where on a sale of land ·owned by a husband and wife and purchase of other land with the proceeds, the husband voluntarily had the title taken in the name ·of the wife, this was a gift to the wife, and she took the premises free and clear of any interest of the husband, unless he should afterwards become entitled to curtesy.

2. In a suit to set aside a conveyance made by the complainants soon after their mother's death ·to their step-father, evidence *held* to show that the step-father did not disclose to the complainants that the property was their mother's, and that he had ho interest in it, and that the complainants paid little attention to the matter and relied on what he said.

3. Where the relations between a step-father and step-children were of such character as usually subsists between parent and child, a relation of trust and confidence existed, and where in conveying their deceased mother's land to the step-father the step-children did not have independent advice, were not informed of their rights, and did not understand the purport of their act, they were entitled to have the deed set aside.

4. Upon the setting aside of a deed from step-children to their step-father made as part of a so-called settlement of their mother's estate, the *status quo* must be restored by the return by the sons of anything received by them in excess of their distributive shares.

5. A suit by complainants to·set aside a deed ·made to their step-father shortly after their mother's death in 1919, *held* not barred by laches where the relation of trust and confidence continued to exist down to 1921.

On bill, &c.

*Mr. John S. Craven* and *Mr. L. Edward Herrmann,* for the complainants.

*Mr. Louis A. Cowley,* for the defendants.

GRIFFIN, V. C.

The bill in this cause is filed, among other things, to set aside a conveyance made by two step-sons to the step-father under the following circumstances: The mother of the complainants, by her first marriage, had.two sons, who are now twenty-eight and thirty years of age, respectively. The father of these sons died about the year 1902. In 1907 their mother married Mr. Vonderheyden (who will hereafter be called the defendant) and she died in 1919. At the time of the marriage to the defendant these children were aged about thirteen and fifteen years, respectively. The relations between the step-father and the children appear to have been, at all times down to 1921, of such character as usually exists between parent and child. When the defendant married complainants' mother the mother had a few hundred dollars. It does not appear that the husband had anything. The defendant worked, the children worked, and the earnings were thrown into hotchpot. Certain lands were bought in the name of the husband and wife, which were sold for about $6,000, from which they received about $5,200 net, some $3,700 of which was used to purchase the premises in question, the title to which was taken in the name of the wife, since deceased. This was done voluntarily by the defendant because he had had an auto accident and was advised that it would be well to have the deed made to his wife, so that, in case of future accidents, he would be execution proof. (This is not the language used, but this is what it means.) Clearly, whatever came from the sale of this property in 1917, which ordinarily would become the share of the husband, constituted a gift to the wife in the purchase of this property, so that she took the premises free and clear of any interest of the husband in the premises (*Fretz* v. *Roth,* 70 N. J. Eq. 764), unless he should become entitled to curtesy. This feature is entirely settled, because the wife died without issue by the defendant, born alive. Thus the entire estate at her death vested in fee-simple in the children.

Shortly after the death of the mother the father consulted Mr. Cowley, a member of the bar, and learned from him that

he had no estate in the lands, and that, as to personalty, he would be entitled to one-third and the children to two-thirds. He then asked the children to settle up the estate, and took them to the office of Mr. Cowley, and, the deeds being prepared, the children signed a deed of the property to the defendant. At the same time $1,000 was paid to August, and a deed of lot 516 was made by August and the father to Emil. This was done pursuant to a conversation had prior thereto, wherein it was suggested that the estate be settled up, and the father said that August would get a thousand dollars and Emil would get this lot and the balance of the money in the bank, which then consisted of about $1,800, out of which certain expenses were to be paid which would reduce the amount to about $500. This balance was not paid to Emil.

The father's version of the story is this: That he told the boys of a conversation he had with their mother prior to her death, in which the mother (apparently recognizing the right of the father in the property which was the result of their joint earnings, and also the earnings of the children), said to make division by giving $1,000 to August and giving this lot to Emil. There was nothing said about his retaining the balance. It was evidently assumed by the husband and wife, if the story of the defendant is taken to be true, that the remaining property was to be that of the husband upon her death. He did not, however, ask his wife to make a will; which would be the natural manner of disposing of the property; and he excused his failure to do this upon the ground that his wife was suffering from cancer and did not know that she was so seriously ill, and he did not want to discourage her. I fail to see the force of this story. If the wife made the suggestion of a *post-morten* division of her property, she was evidently speaking in contemplation of death, and the most natural thing in the world for the husband to have done would have been to say, "Well, why don't you make a will?" This was not done.

The story of the sons that they knew nothing about the title to this property at the time when they made the convey-

ance is worthy of more credence. At the time that the conveyance was made the defendant knew that he had no interest in law in this property and was only entitled to one-third of the personalty. He asked his step-sons (who reposed implicit trust and confidence in him) to exchange deeds which would enable him to hold lots 514 and 516, with the building thereon, at the lowest estimate worth about $6,000, while one son got a thousand dollars and the other a lot worth between three hundred and fifty and five hundred dollars. The sons testify that they did not know that the fee-simple was vested in them free from any claim of the defendant; and this, I believe, to be the fact; and they also deny that any such conversation as the defendant testifies to was had between them and the defendant. In the deeds drawn, as I recall it, there is a recital that Mrs. Vonderheyden died intestate, leaving her surviving as her heirs-at-law the two sons and the defendant, which might convey the idea that the defendant had some interest in the property when he had none.

One son was married prior to his mother's death and lived in the family of his mother and step-father until the world war broke out, when he entered the service and was discharged about May, 1919, a few weeks before his mother died. The other son was unmarried and served about three years in the army on the Mexican border and in the world war, and came home about the same time as the other brother. The wife of one son, after the death of the mother, managed the household, and the relations of all the parties were quite pleasant until about the spring of 1921, when dissensions arose. It seems that the defendant took another wife in, I think, 1921. One of the sons, August, after the marriage of the step-father, resided part of the time in Brooklyn and worked in Passaic. Emil resided at the home of the father, with his wife, and they say that the understanding was that Emil was to pay $5 a week board, and that there was no charge to be made for his wife's board, as she was the housekeeper. In April, 1921, Emil, having been out of work, obtained a job painting an adjoining house, for which he got $60, and his wife tendered, either to the defend-

ant or his wife, a payment of $35 on account of Emil's board. Some dispute then arose, whereupon Emil telephoned to August at the mill, and August came up, and they had rather a' heated conversation, in which August took the deeds to his mother and to Emil from the drawer, and they say then, for the first time, they learned that the property was. the mother's property, although the deed itself recites the fact that it was the property of the mother.

I am inclined to the view that the father did not disclose to these children the fact that the property was their mother's and that he had no interest in it. I am also satisfied, by reason of the close relations that existed between the parties, that the sons paid very little attention to the matter, relying wholly upon what the defendant said.

Therefore, the question arises, taking the relationship existing, Was the defendant bound to make a full disclosure of the situation to these children, so that they might judge for themselves whether they would make the conveyance? If, under the law, he was bound to make the disclosure, then he must reconvey, upon terms which will restore the *status quo.*

In *Hall* v. *Otterson, 52 N. J. Eq. 522; affirmed, 53 N. J. Eq. 695,* Vice-Chancellor Green (at *p. 528*), said: "In all transactions between persons occupying relations, whether legal, natural or conventional, in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who had acquired an advantage, to show affirmatively not only that no deception was practiced thereon, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." Citing cases.

The same doctrine was applied in *Slack* v. *Rees, 66 N. J. Eq. 447* (at *p. 449*).

In view of the doctrine of the law thus enunciated, it being quite plain to me that these children did not have the benefit of independent advice, and that the relation of trust and confidence existed quite as fully between these children and the

step-father as between parent and child; that they were not informed as to their rights in the premises, and did not understand the purport of their act; and in view of the fact the burden of proof is cast upon the defendant, and he having failed, the decree should be for the complainants; but the *status quo* must be restored. This may be done, so far as the children are concerned, by the son August bringing into the personal estate the thousand dollars, with interest, or so much thereof as he would not be entitled to as his distributive share. There may be other features on this point which counsel may point out. This is a mere suggestion of what now occurs to me as to one item in which the defendant may be interested.

I make no point at this time of the conveyance to the other son, Emil, of the vacant lot, because, as I recall it, that became vested in the two sons on the death of their mother, and the defendant has no interest in it.

On the point of laches I do not find that there is any laches in this case. *Hall* v. *Otterson, 52 N. J. Eq. 534.*